CANADIAN AGENCY, Limited, v. ASSETS REALIZATION CO. et al. (No. 6496.)

(Supreme Court, Appellate Division, First Department. December 18, 1914.)

1. CORPORATIONS (§ 117*) — SALE OF STOCK — INDEPENDENT AGREEMENT — BREACH OF CONTRACT OF SALE.

   Where there is no allegation that an independent agreement to make a market for the stock was a condition of the sale of the stock, a breach of the independent agreement does not authorize a rescission of the sale.

   [Ed. Note.—For other cases, see Corporations, Cent. Dig. § 506; Dec. Dig. § 117.*]

2. FRAUD (§ 45*)—PLEADING—KNOWLEDGE.

   A complaint at law for damages for fraud is insufficient, where there is no allegation of knowledge.

   [Ed. Note.—For other cases, see Fraud, Cent. Dig. § 40; Dec. Dig. § 45.*]

3. SALES (§ 113*)—RESCISSION—GROUNDS—INNOCENT MISREPRESENTATIONS.

   To justify the rescission of a contract in equity for innocent misrepresentations by the seller, the essentials are misrepresentation as to a material fact, reliance on the misrepresentation, diligent offer to return, and no material change in the situation of the parties between the time of purchase and the time of the offer to return.

   [Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 286, 287; Dec. Dig. § 113.*]

4. CORPORATIONS (§ 117*)—SALE OF STOCK—RESCISSION IN EQUITY—INNOCENT MISREPRESENTATIONS.

   Where the owners of stock in a corporation innocently represented that the corporation was a successful going concern, earning during stated periods a sum which would make available $800,000 per year, when as a fact the corporation had during the periods named earned no sum so available for dividends, and that it was commencing business with a capital $100,000 less than the sum stated, authorizes a rescission in equity.

   [Ed. Note.—For other cases, see Corporations, Cent. Dig. § 506; Dec. Dig. § 117.*]

Appeal from Special Term, New York County.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Webster and others appeal.  Affirmed, with leave to withdraw demurrer and answer.

Argued before INGRAHAM, P. J., and LAUGHLIN, SCOTT, DOWLING, and HOTCHKISS, JJ.

Alexander B. Siegel, of New York City, for appellants.

Samuel Untermyer and Irwin Untermyer, both of New York City, for respondent.

DOWLING, J.   The facts admitted by the demurrer herein may be summarized as follows:  The individual defendants compose the respective firms of Kidder, Peabody & Co., and F. S. Moseley & Co. Prior to October, 1912, said firms, together with the defendant corporation Assets Realization Company, were joint owners of certain shares of stock in the United States Worsted Company (a corporation organized under the laws of the commonwealth of Massachusetts, hereinafter referred to as the Company, including first preferred stock, second preferred stock, and common stock, in excess, in each of said classes, of the amounts subsequently purchased by the plaintiff.   In the months of October and November, 1912, the defendants, by Ladenburg, Thalman & Co., their agents, duly authorized in that behalf, represented to the plaintiff that the Company was then earning at the rate of 7 per cent. on its first and second preferred stock, and, in addition thereto, over 2 per cent. on the common stock, and that the Company throughout past years had earned an average in excess of $800,000 per annum in net profits; further, that the net earnings of said Company throughout past years had averaged and were equal in amount per year to the figures appearing in the first column of a certain statement which was then furnished to plaintiff, and of which the following is a copy, and that based upon such past net earnings the estimated net earnings thereafter would be shown on the second column of said statement:

Statement of Income Available for Dividend Distribution.

|  | Based on Results of past Years. | Estimated on Consolidation. |
|---|---|---|
|  | $800,000 | $1,000,000 |
| Seven per cent. dividend on first preferred stock ............................... | 350,000 | 350,000 |
|  | 450,000 | 650,000 |
| Seven per cent. dividend on second preferred stock ...........................,............... | 280,000 | 280,000 |
|  | $170,000 | $ 370,000 |
| Equals on common stock......................... | 2¼% | 5¼% |

It was further represented to the plaintiff that the Company was commencing operations with a working cash capital of $2,500,000; that between July 1, 1912, and November 1, 1912, it had earned a surplus at the rate of $800,000 per annum, all of which was available for dividend distribution, and that the value of its plant, merchandise, and other quick assets was $9,000,000.   The defendant during said months further represented to plaintiff that the assets and

liabilities of the Company were equal in amount to the figures appearing in a certain statement which was then furnished to the plaintiff, and of which the following is a copy:

### Assets.

| | | |
|---|---:|---:|
| Plants, water power, and good will | $12,260,797 | 74 |
| Bills and accounts receivable | 1,218,167 | 75 |
| Inventories of merchandise, etc. | 3,441,976 | 13 |
| Investments | 153,132 | 07 |
| | $17,137,073 | 69 |

### Liabilities.

| | | | | |
|---|---|---:|---:|---:|
| Capital—First preferred | $5,000,000 | | | |
| Second preferred | 4,000,000 | | | |
| Common | 7,000,000 | | | |
| | | $16,000,000 | 00 | |
| Payables | 3,611,262 | 82 | | |
| Less cash | 2,474,189 | 13 | | |
| | | 1,137,073 | 69 | |
| | | $17,137,073 | 69 | |

The plaintiff, which is a foreign corporation organized under the laws of the United Kingdom of Great Britain and Ireland, in reliance upon said representations, agreed with the defendants to accept and pay for, and in or about the month of November, 1912, did accept and pay for, 425 shares of the first preferred stock, 150 shares of the second preferred stock, and 250 shares of the common stock of said company, for which plaintiffs paid to the defendants the sum of $52,500. Plaintiff further alleges:

"Ninth. Said representations were false—in that, in truth and in fact, the United States Worsted Company was making no current earnings whatever at the time said representations were made; in that, based upon the results of the operations of past years, there would not be available for dividends on the company's stocks a sum equal, or nearly equal, to $800,000, or any sum whatever; in that the plants, merchandise, and other quick assets of the United States Worsted Company were not of the value of $9,000,000, and did not exceed the sum of $8,107,000; in that the United States Worsted Company, between July 1, 1912, and November 1, 1912, had earned no surplus available for dividend distribution, and earned no surplus whatever, but that it had, on the contrary, lost heavily in its operations; in that the company was not commencing and did not commence operations with a working cash capital of $2,500,000; in that the $2,474,189.13 represented as cash was not working cash capital, and it was commencing and did commence operations without any working cash capital whatever. Said representations were also false—in that the bills and accounts receivable of said company and the inventories of merchandise did not together exceed $3,830,143.88; in that the payables, in truth and in fact, far exceeded $3,941,000. Said representations were also false, in that the investments of said company, represented as aforesaid to have been $153,132.07, did not exceed $54,000."

Plaintiff alleges it would not have entered into the agreement with the defendants, and would not have paid said consideration, except for the false representations made by the defendants, which it believed to be true, and on which it relied in acquiring said stock. In or about the month of April, 1913, and immediately upon discovery of the fact that said representations were false, plaintiff offered to

return said shares of stock to the defendants, and duly demanded the repayment to it of the consideration paid therefor; but the defendants have at all times refused and still continue to refuse to accept the return of said stock, or to repay plaintiff any part of the consideration paid therefor, although the plaintiff is ready, able, and willing to return the shares of stock received by it as aforesaid, and offered said shares of stock to the defendants upon the return to him of the amount paid by him in consideration therefor. Further, that between the time the defendants accepted payment for said stocks and the demand by the plaintiff for the return of the money so paid there was no material change in the situation with respect to said United States Worsted Company. It is also claimed that part of the agreement, pursuant to which plaintiff agreed to purchase the stocks, was that plaintiff promised and agreed to and with the defendants to withhold from sale the first and second preferred stocks of the Worsted Company for a period of six months from and after the 20th day of November, 1912, and the defendants promised and agreed to and with the plaintiff, as a condition on their part to be performed, that within said period of six months the copartnership of Kidder, Peabody & Co. would establish a market for said stocks by making a public offering of the first preferred stock in the markets of America, of London, and of Amsterdam at not less than par, and by making a public offering of the second preferred stock in the American markets at not less than 80, all of which said firm has failed to do.

The relief sought is that the contract and sale executed as aforesaid, and the payments of money and the transfers of the stock executed under said contract and in pursuance thereof, be rescinded, annulled, declared void, and set aside, and that the plaintiff redeliver to the defendants the shares of stock in question, and that the defendants repay to the plaintiff all the moneys received by them from plaintiff, with interest from the date of such payments.

[1] As we deem the alleged agreement that a market would be created for the first and second preferred stock to have been an independent agreement, and there is no allegation that a condition of the sale was that, if the defendants did not create a market, title to the stocks should be reassumed by them and the purchase price repaid, we think that so far as that branch of the case is concerned, in the present state of the pleadings, the plaintiff could not do more than sue for damages, if any, which it might have sustained by reason of the failure to carry out such independent agreement, and such breach did not warrant rescission. Muller v. Eno, 14 N. Y. 597.

[2] But the important question presented by the appeal is whether the facts stated warranted a rescission of the contract upon the ground of defendants' misrepresentations. While the demurrer admits that the representations made were not in fact true, it will be noticed that there is no allegation of scienter upon the part of defendants, such as would be required to sustain an action brought at law to recover damages for fraud. Concededly the complaint would be insufficient to sustain such an action, because of the failure to allege knowledge

upon the part of the defendants of the falsity of the representations made by them. But this is an action brought in equity for the rescission of the contract between the parties upon the theory of an innocent misrepresentation made by the sellers, which induced the buyer to purchase property in reliance upon the misrepresentations, in the absence of which he would not have bought.

[3] The essentials to justify a rescission of a contract under such conditions, as gathered from the authorities, appear to be: First, the misrepresentation of a material and substantial fact in relation to the property sold; second, a reliance upon such misrepresentation by the purchaser, who is induced thereby to make the purchase; third, an offer to return the property bought promptly upon the discovery of the falsity of the representations; and, fourth, no material change in the situation of the parties between the time of the purchase and the time of the offer to return. While the court at Special Term deemed this a case of mutual mistake (and it is such from one point of view, since both parties were mistaken as to material facts affecting the property sold), still it is something more than that, for the defendants, desirous of inducing the sale of the property which they owned, voluntarily made representations concerning it for the purpose of inducing others to purchase, intending and knowing that prospective purchasers would rely upon such representations as an inducement for their acquisition of the defendants' property. Had the defendants chosen to keep silent regarding the property which they offered for sale, the rule of caveat emptor would have applied, and plaintiff would have been without relief, if he had bought the property without investigation of any kind.

When persons who have property which they desire to sell offer it in the market, and make representations as an inducement for its purchase, they assume the burden of seeing to it that the representations which they make are true, and if they do not purport to be made upon their personal knowledge, they must show the source of the belief which they entertain as to the truth of the representations. Defendants were under no obligations to make representations as to the property which they were offering to the public, save in so far as they would induce investigators to take stock off their hands, and every sound consideration of business morality, as well as of equitable jurisdiction, would seem to call for their being held accountable for false representations made by them, even if they did not show them to be false, and therefore were not guilty of actual fraud. The general rule as laid down in Parsons on Contracts (9th Ed.) vol. 2, p. 775, is as follows:

"Though an innocent misrepresentation, even if relied upon, will give no right to damages in a court of law, relief may be given in equity. A suit for rescission of a contract or conveyance will be sustained in equity, though the misrepresentation on which the suit is based was made innocently. Reese, etc., Mining Co. v. Smith, L. R. 4 H. L. 64; Arkwright v. Newbold, 17 Ch. D. 301, 320; Redgrave v. Hurd, 20 Ch. D. 1; Nelson v. Wood, 62 Ala. 175; Black v. Walton, 32 Ark. 321; Shelton v. Ellis, 70 Ga. 297; Allen v. Hart, 72 Ill. 104; Hicks v. Stevens, 121 Ill. 186 [11 N. E. 241]; Dunn v. White, 63 Mo. 181; Cowley v. Smyth, 46 N. J. Law, 380 [50 Am. Rep. 432]."

In this state Chief Judge Andrews, in Kountze v. Kennedy, 147 N. Y. 124, 41 N. E. 414, 29 L. R. A. 360, 49 Am. St. Rep. 651, recognized the existence of such a rule in the following language:

"If the misrepresentation was honestly made, believing it to be true, whatever other liability he may incur, he cannot be made liable in an action for deceit. The law affords remedies for the consequences of innocent misrepresentation. A contract induced thereby may, in many cases, be avoided, and the equitable powers of courts are frequently interposed for the rescission of contracts or transactions based upon mistake or innocent misrepresentation. While the common-law action of deceit furnishes a remedy for fraud which ought to be preserved, we think it should be kept within its ancient limits, and should not by construction be expanded to embrace dealings which, however unfortunate they may have proved to one of the parties, were not induced by actual intentional fraud on the part of the other."

In Hammond v. Pennock, 61 N. Y. 145, Commissioner Dwight said:

"The case has thus far been considered as though the fraud requisite as a basis for rescinding a contract in equity is the same in nature as that demanded in a court of law in an action for damages for deceit. In equity, the right to relief is derived from the suppression or misrepresentation of material fact, though there be no intent to defraud. Per Lord Romilly, in Peek v. Gurney, L. R. 13 Eq. 79, 113; Wilcox v. Iowa University, 32 Iowa, 367. This view has been applied to innocent misrepresentations in a prospectus, providing that they were of the essence of the contract. Smith v. Reese River Co., L. R. 2 Eq. 264; Kennedy v. Panama Co., L. R. 2 Q. B. 580. This doctrine is substantially grounded in fraud, since the misrepresentation operates as surprise and imposition upon the opposite party to the contract. It is inequitable and unconscientious for a party to insist on holding the benefit of a contract which he has obtained through misrepresentations, however innocently made. 1 Story, Eq. Jur. § 193, and cases cited; Perry on Trusts, § 171. There can be no doubt that, in this aspect of the case the defendant obtained the property of the plaintiff through misrepresentations which are material, even though it be assumed that they were made without bad intent on his part."

In Roberts v. Fisher, 43 N. Y. 159, 3 Am. Rep. 680, plaintiff sued for a balance due for goods sold and delivered, to which the defendants set up a defense of payment, claiming the plaintiff had received a note of Homer Rice & Co. in full payment of the discharge of the debt, when in fact the latter had stopped payment on the 16th of the month, the note having been delivered on the 17th. At the time of the transfer of the note the insolvency of Homer Rice & Co. was not known to either party. In reversing the judgment for defendants, the court said that upon broad principles of justice it would seem that a man should not be allowed to pay a debt with worthless paper, though both parties supposed it to be good. In the course of the opinion it was said:

"If A. sell to B. a horse on a farm, and get his pay by note, the horse being considered as delivered there, and it turn out, contrary to the expectation of both, that the horse was accidently killed on the day before the sale, it would scarcely be pretended that A. could recover on the note; yet it is difficult to distinguish the cases in principle."

And further (43 N. Y. 163, 3 Am. Rep. 680):

"The parties made this contract in ignorance of a material controlling fact, viz., the insolvency of Rice & Co. Had that been known to the plaintiffs, it

is quite clear they would not have accepted this note; the contract would not have been made. Had it been known to the defendants (as the proof shows it was not), the transfer of the note would have been a fraud upon the plaintiffs, and would have avoided the contract. Both being ignorant of such a fact, the plaintiffs are allowed to rescind the contract in the courts of this state."

The court quoted with approval Leger v. Bonnaffe, 2 Barb. 475, where a party had purchased bills of exchange on a foreign house, which had then failed, unknown to the parties here, and paid for them in notes of third persons; and it was held that the purchaser might rescind the purchase, as founded in mutual mistake, and that he could reclaim his notes; and also Baldwin v. Van Deusen, 37 N. Y. 487, where the defendant had sold the notes of one Onley as genuine, who it was subsequently discovered was an infant—a mutual mistake—and it was held that this gave the right of rescission to the plaintiff upon the discovery of the mistake.

Wilson v. Randall, 67 N. Y. 338, was a case of an executed contract for the purchase of land, where, instead of receiving 56.15 acres, as shown by the survey, upon which basis plaintiff paid for the property at an acreage price, there were but 48.47 acres in the tract. The court said that by a mistake, induced in whole or in part by the untrue, though not fraudulent, representation of the defendant—

"the plaintiff has paid for 56.15 acres, and the mistake was not known to him until after the conveyance was executed. It is very just that under these circumstances the plaintiff should recover back the money paid for the land in excess of the actual quantity, and the law, we think, justifies the recovery in this case."

In Carr v. Nat. Bank & Loan Co. of Watertown, 167 N. Y. 375, 60 N. E. 649, 82 Am. St. Rep. 725, which was an executed contract for the purchase of certain bonds, the court said:

"The appellant argues that the facts did not establish any actual fraud on the part of the defendant. But that was not essential to the granting of the relief plaintiff demanded. There was shown to have been such a condition of things, in the situation of the parties and in the ignorance in which the plaintiff was kept of material facts, by ways of suppression or of misrepresentation, as in equity to warrant her in wholly repudiating the transaction. It is quite immaterial that there may have been no intention to actually defraud. Hammond v. Pennock, 61 N. Y. 145."

A similar rule has been laid down in the United States Supreme Court. Thus, in Smith v. Richards, 13 Pet. 26, 10 L. Ed. 42, which was a case of an executed contract for the purchase of certain gold bearing lands upon false representations, Justice Barbour said:

"It is an ancient and well-established principle that whenever suppressio veri or suggestio falsi occur, and more especially both together, they afford sufficient ground to set aside any release or conveyance. This ancient principle, thus expressed with so much sententious brevity, is laid down in terms somewhat more comprehensive, and having a direct bearing on the present case, by a modern text-writer on equity. In 1 Madd. Chan. 208, it is thus stated: 'If, indeed, a man, upon a treaty for any contract, make a false representation, whether knowingly or not, by means of which he puts the party bargaining under a mistake upon the terms of bargain, it is a fraud, and relievable in equity.' The doctrine thus laid down is almost in the very words used by the Chancellor in the case of Neville v. Wilkinson, 1 Bro. C. C. 546,

with the exception of the words 'whether knowingly or not'; and the part of the proposition embraced by these words is founded upon the case of Ainslie v. Medlycott, 9 Ves. 21, which fully sustains Mr. Maddock. In this latter case, the following strong language is used: 'No doubt, by a representation, a party may bind himself just as much as by an express covenant. If knowingly he represents what is not true, no doubt he is bound. If, without knowing that it is not true, he takes upon himself to make a representation to another, upon the faith of which that other acts, no doubt he is bound, though his mistake was perfectly innocent.' "

After quoting with approval certain English cases, and those of Fulton's Executors v. Roosevelt, 5 Johns. Ch. 174, and McFerran v. Taylor, 3 Cranch, 281, 2 L. Ed. 436, in the latter of which the court said:

"He who sells property on a description given by himself is bound to make good that description; and if it be untrue in a material point, although the variance be occasioned by a mistake, he must still remain liable for that variance"

—Justice Barbour then proceeded to say:

"The principles of these cases we consider founded in sound morals and law. They rest upon the ground that the party selling the property must be presumed to know whether the representation which he makes of it is true or false. If he knows it to be false, that is fraud of the most positive kind; but if he does not know it, then it can only be from gross negligence, and in contemplation of a court of equity a representation founded on mistake, resulting from such negligence, is fraud. 6 Ves. 180, 189; Jeremy, 385, 386. The purchaser confides in it, upon the assumption that the owner knows his own property, * * * and, as was well argued in the case in Cranch, it is immaterial to the purchaser whether the misrepresentation proceeded from mistake or fraud. The injury to him is the same, whatever may have been the motives of the seller."

Other cases in which sales were rescinded upon the ground of false representations innocently made by the defendant are Turner v. Ward, 154 U. S. 618, 14 Sup. Ct. 1179, 23 L. Ed. 391; Doggett v. Emerson, 7 Fed. Cas. No. 3960; Joslyn v. Cadillac Automobile Co., 177 Fed. 863, 101 C. C. A. 77.

It is unnecessary to cite cases in other jurisdictions where similar relief has been upheld. Their general purport is well stated by a single quotation from Spurr v. Benedict, 99 Mass. 463, in the case of an executed contract, where the court said:

"Mistake is a head of equity jurisdiction, distinguished from fraud. Relief is granted on the ground that it would be unconscientious to oblige a man, who has not been himself negligent or in fault, to adhere to his bargain, and to retain property which he was induced to purchase by a misapprehension as to a material and essential circumstance, which he was led into by the conduct of the other party. * * * The defendant was himself mistaken as to what he owned, and consequently misled the plaintiff, and under the influence of the mutual error the transaction was consummated. But the prejudicial consequences to the purchaser are the same as if the conduct of the vendor had been designedly fraudulent."

In England, where the tendency has been to hold the issuers of prospectuses to strict accountability, wherever the public had subscribed for shares on the faith thereof, it was held in Smith v. Reese River Company, L. R. 2 Eq. 263, that the shareholder who had subscribed on the faith of the prospectus was entitled to an injunction against an

action for calls, although the directors themselves had been deceived, and had been guilty of no willful fraud. In Peek v. Gurney, L. R. 13 Eq. 79, the court held that directors who induced the public to join in a speculation which they honestly believed would turn out successful would be liable if they did not give the public all the information which they themselves possessed of the matter, even though they believed such concealment would be beneficial to those they induced to go into the venture. In Redgrave v. Hurd, 20 Ch. D. 1, the defendant obtained judgment upon his counterclaim rescinding an agreement for the purchase of a house, the inducement to buy which was that the purchaser should be taken into partnership as a solicitor with the seller, whose business was represented to amount to £300 a year, the seller having paid a deposit and taken possession, but seeking to rescind when he discovered that the practice would not equal the representation, and setting up a demand for rescission as a counterclaim to the seller's action for specific performance. The court said:

"According to the decisions of the courts of equity, it was not necessary, in order to set aside a contract obtained by material false representation, to prove that the party who obtained it knew at the time when the representation was made that it was false. It was put in two ways, either of which was sufficient. One way of putting the case was: 'A man is not to be allowed to get the benefit from a statement which he admits to be false. He is not to be allowed to say, for the purpose of civil jurisdiction, that when he made it he did not know it to be false; he ought to have found that out before he made it.' The other way of putting it was this: 'Even assuming that the moral fraud must be shown in order to set aside a contract, you have it where a man, having obtained a beneficial contract by a statement which he now knows to be false, insists upon keeping that contract. To do so is moral delinquency; no man ought to seek to take advantage of his own false statements.'"

Pollock, in his work on the Principles of Contract (4th Ed.), in chapter 10, which is devoted to the right of rescission, expressly recognizes that right as applicable to cases of simple misrepresentation where the truth thereof in any way goes to the essence of the contract, as well as to cases of fraud. That writer also lays down the proposition (page 553) that:

"Even willful ignorance may have the same consequences as fraud. So may ignorance, which, though not willful, is reckless; as when positive assertions of fact are made as if founded on the party's own knowledge, whereas in truth they are merely adopted on trust from some other person. The proper course in such a case is to refer distinctly to the authority relied upon."

And again at page 524:

"The affirmation of a thing as within my own knowledge implies the affirmation that I have peculiar means of knowledge; and if I have not such means, then my statement is false, and I shall justly be held answerable for it, unless, indeed, the special knowledge thus claimed is of a kind manifestly incredible."

Anson on Principles of the English Law of Contract (13th English Ed.) page 172, says:

"Fraud differs from innocent misrepresentation, in that one does, and the other does not, give rise to an action ex delicto. Fraud is a wrong in itself, and may be treated as such, besides being a vitiating element in contract. In-

nocent misrepresentation may vitiate a contract, but never gives rise to an action ex delicto, the action of deceit. 'It must be borne in mind,' says Cotton, L. J., 'that in an action for setting aside a contract which has been obtained by misrepresentation the plaintiff may succeed, though the misrepresentation was innocent; but in an action of deceit, the representation to found the action must not be innocent, that is to say, it must be made either with a knowledge of its being false, or with a reckless disregard as to whether it is or is not true.' Arkwright v. Newbold, 17 Ch. D. 320."

The author then lays down the proposition (Id. p. 182):

"Innocent misrepresentation which brings about a contract is now a ground for setting the contract aside, and this rule applies to contracts of every description" (citing Redgrave v. Hurd, 20 Ch. D. 1, and Newbigging v. Adam, 34 Ch. D. 582).

And Id. p. 184:

"This principle is clearly stated by Lord Bramwell in Derry v. Peek, 14 App. Cas. 347, speaking of the various rights of one who has been injured by the untruth of statements inducing a contract: 'To this may now be added the equitable rule that a material misrepresentation, though not fraudulent, may give a right to avoid or rescind a contract, where capable of such rescission.' "

The text-writers upon the subject of equity jurisdiction have all recognized the right to rescind in case of mistake. Thus Story in his Commentaries on Equity Jurisprudence (13th Ed.) p. 149, lays down the general rule that an act done or a contract made under a mistake or ignorance of a material fact is voidable, and relievable in equity; the only qualification being that it must be material to the act or contract. Then, at page 159, he says that in cases of mutual mistake going to the essence of the contract it is by no means necessary that there should be any presumption of fraud, but, on the contrary, equity may even relieve, however innocent the parties may be; and at page 213:

"Whether the party thus misrepresenting a material fact knew it to be false, or made the assertion without knowing whether it were true or false, is wholly immaterial; for the affirmation of what one does not know or believe to be true is equally in morals and law as unjustifiable as the affirmation of what is known to be positively false. And even if the party innocently misrepresents a material fact by mistake, it is equally conclusive; for it operates as a surprise and imposition upon the other party."

Willard's Equity Jurisprudence (Potter's Ed.) 69, thus states the proposition:

"Courts of equity sometimes give relief in cases of mutual mistakes, unaccompanied by fraud, when the property which one party intended to sell, and the other intended to buy, did not in fact exist, or where the subject-matter of the sale and purchase is so materially variant from what the parties supposed it to be that the substantial object of the sale and purchase entirely fails. *   *   *"

In Pomeroy's Equity Jurisprudence (3d Ed.) vol. 2, § 856, there are two requisites laid down—

"essential to the exercise of the equitable jurisdiction in giving any relief, defensive or affirmative: The fact concerning which the mistake is made must be material to the transaction, affecting its substance and not merely its incidents, and the mistake itself must be so important that it determines the conduct of the mistaken party."

In Beach on Modern Equity Jurisprudence, vol. 1, pp. 48 to 57, inclusive, the question of mutual mistakes of fact is treated, and the conclusion reached that mutual mistake, as distinguished from fraud, imports that both parties were innocently ignorant or mistaken as to some matter material to the contract, and that if the mistake of one party is induced by representations or acts of the other party it amounts to fraud, rather than mistake. But in any event each party to a contract is required to be vigilant, and to abstain from stating anything tending to deceive or mislead the other. If, as the result of such a representation as to a material fact, one party will obtain an advantage over the other, they will be restored to their original condition, even where the contract has been executed. ·

In Eaton on Equity, page 270, the rule is laid down that:

"A mistake as to the nature or fundamental qualities of the subject-matter, so that it goes to the whole substance of the agreement and renders the subject-matter contracted for essentially different in kind from the thing as it actually exists, may avoid the contract. Thus equity will set aside a sale of land entered into by both parties under the belief that it is underlaid with coal, or covered with standing pine, where it appear that the land has no value for mining or lumbering. So a belief by both parties to a deed that the land conveyed includes land on which a building is located, which was the main inducement to the purchase, is grounds for rescission."

At page 276:

"There is no doubt but that a court of equity has the same power to correct a mistake occurring in an executed contract as in an executory contract."

[4] The misrepresentation which is admitted to have been made herein cannot be regarded otherwise than as a material one. The jurisdiction of equity is not exercised merely because the purchaser did not receive the specific property or thing which was the subject of the bargaining of the parties. The cases where such relief has been granted, even where the contract has been fully executed, are cases where, while there has been technical performance with the terms of the contract, so that the buyer receives something which answers the description of the thing, yet there has been some defect or depreciation or change or infirmity in it, which rendered it not the thing that both parties thought was passing in the transaction. So here the papers which passed represented certificates of stock in a corporation, but not in a corporation in the condition which both parties believed it to be in; nor did the shares represent an interest in such a corporation as both parties believed was the basis of the transaction.

What the plaintiff was offered and requested to buy by the defendants, and what it thought it was purchasing from them when it paid the price which they demanded, was stock in a going, successful corporation which had been earning a sum in the past years based on which there would be an amount available for dividend distribution of at least $800,000, and which, for the six months between July 1, 1912, and November 1, 1912, had earned a surplus available for dividend distribution at a rate of over $800,000 per annum, instead of which it had, during the first of said periods, earned no sum whatever available for dividends, and during the second period referred to, of four months, had not only not earned any surplus available for

dividend distribution, but had lost heavily in its operations. Plaintiff believed that it was buying stock in a profitable concern, earning money, whereas in fact the stock which it received was that of a corporation earning nothing whatever. Plaintiff believed it was buying stock in a corporation which was commencing operations with a working cash capital of $2,500,000, whereas in fact it had no working cash capital whatever. It believed it was buying stock in a corporation whose bills payable and inventories were in excess of $100,000 of what was actually the fact, and whose investments it believed to be $100,000 in advance of what was actually the fact.

All of these beliefs of the plaintiff were warranted by the representations made to it by the defendants as to the integrity, security, and desirability of the securities bought by the plaintiff, and were of vital importance, not only in arriving at their value, but in determining their desirability as an investment, and their safety as well. Under these conditions, we believe that the requirements for the maintenance of such an action in equity have been fully met. There is a misrepresentation of material facts in relation to the property sold, relied upon by the plaintiff, without which misrepresentation it would not have made the purchase in question, followed by a tender of the property bought, and a demand for its purchase price, as soon as the misrepresentation was discovered, and before there was any material change in the relations of the parties or of the corporation whose stock was the subject of the sale. The other phase of the complaint, with respect to the agreement of the defendants to create a market for this stock, we have already stated to be deemed by us a separate and independent agreement upon the part of defendants, which would not justify the rescission of the contract.

The judgment appealed from will therefore be affirmed, with costs, with leave to the appellants to withdraw demurrer and to answer within 20 days on payment of costs in this court and in the court below. All concur.